IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 13, 2020

FILED
03/11/2021
Clerk of the
Appellate Courts

## PHILLIP MATTHEW BURGESS v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Marshall County
No. 2014-CR-105-PC[1]     M. Wyatt Burk,[2]  Judge**

_____

### No. M2020-00028-CCA-R3-PC

_____

The Petitioner, Phillip Matthew Burgess, appeals as of right from the Marshall County Circuit Court's denial of his petition for post-conviction relief, wherein he challenged his convictions for premeditated first degree murder, attempted first degree murder, and aggravated assault.  On appeal, the Petitioner asserts that he received the ineffective assistance of trial counsel[3] because counsel (1) failed to file a motion or object at trial to the destruction of exculpatory evidence; (2) "coerced" the Petitioner into choosing not to testify; (3) failed to pursue a defense theory of diminished capacity; (4) failed to interview or call several witnesses and subpoena the Petitioner's telephone records; and (5) failed to promptly file a motion to withdraw after a conflict of interest arose.  The Petitioner also contends that he received the ineffective assistance of appellate counsel because counsel failed to call a witness at the sentencing hearing and failed to timely file an application for permission to appeal to the Tennessee Supreme Court after this court filed its opinion in the direct appeal.  Following our review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ. joined.

_____

[1] The post-conviction filings also listed case number 12-CR-1 with or instead of case number 2014-CR-105-PC.  Our review of the record indicates that case number 12-CR-1 refers to the Petitioner's trial proceedings.

[2] Judge F. Lee Russell presided over the first two post-conviction hearings and issued a memorandum opinion and initial order granting post-conviction relief in the form of a delayed Rule 11 appeal and staying consideration of the remaining issues.  Judge Russell retired on November 30, 2017, and Judge Burk took over the proceedings after the Petitioner filed a pro se motion to produce evidence on January 30, 2019.

[3] The Petitioner was represented at trial by two Assistant Public Defenders, to whom we will collectively refer as "trial counsel."

Jonathan C. Brown (at third post-conviction hearing and on appeal), Fayetteville, Tennessee; Matthew Wilson (at the time first memorandum opinion was filed), Lewisburg, Tennessee; and Melissa L. Thomas (at first and second post-conviction hearings), Fayetteville, Tennessee, for the appellant, Phillip Matthew Burgess.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Robert J. Carter, District Attorney General; and William B. Bottoms (at third post-conviction hearing) and Weakley E. Barnard (at first and second post-conviction hearings), Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

*I.     Trial and Direct Appeal*

The Petitioner, Phillip Matthew Burgess, was convicted by a Marshall County jury of premeditated first degree murder, attempted first degree murder, and aggravated assault related to an August 11, 2011 incident in which the Petitioner shot and killed Joey Perryman; shot and wounded Jordan Beavers; and shot at Hunter Keel.[4] State v. Phillip Matthew Burgess, No. M2013-00252-CCA-R3-CD, 2014 WL 309644, at *1 (Tenn. Crim. App. Jan. 28, 2014). The Petitioner received an effective sentence of life.

The evidence presented at trial established that in early August 2011, the Petitioner allowed a friend of a friend, Jeanette Belew, to stay at his apartment with her infant daughter for about six days after she moved to Lewisburg. Burgess, 2014 WL 309644, at *1. Ms. Belew testified that she became uncomfortable with the arrangement after the Petitioner asked her to pretend to be his girlfriend, then later asked her to become his girlfriend. Ms. Belew decided to stay at another male friend's vacant apartment and moved her belongings there on August 6, 2011. Ms. Belew stated at trial that the Petitioner helped her pack. While at her new apartment complex, Ms. Belew encountered Mr. Perryman, as well as Traci Beavers, who was Mr. Perryman's sister, Mr. Beavers, and Mr. Keel, who were both Mr. Perryman's nephews. Ms. Belew was previously acquainted with Mr. Perryman, and the group made plans to eat together at Ms. Belew's new apartment the following day.

Ms. Belew testified that throughout the morning of August 7, 2011, the Petitioner sent her text messages accusing her of stealing his Xanax; he also told her that he would

---

[4] Mr. Beavers and Mr. Keel were both minors at the time of trial. Although it is generally the practice of this court to refer to minors by their initials, because the opinion in the direct appeal refers to both young men by their full names, we will do so here.

bring her mail to the new apartment. Burgess, 2014 WL 309644, at *1. In the afternoon, Ms. Belew was in the shower when she heard a knock at the door. She exited the bathroom and found the Petitioner standing in the living room holding a cell phone, pieces of mail, and a beer. Ms. Belew averred that his presence surprised her because she had not informed him of her new address.

Ms. Belew testified that she "cursed" the Petitioner and told him to leave; however, he instead sat down at the kitchen table. Burgess, 2014 WL 309644, at *2. At this point, Mr. Perryman and Mr. Beavers[5] arrived; when Mr. Perryman asked what was happening, Ms. Belew told him that she could not "get this MF'er out." According to Ms. Belew, Mr. Perryman began cursing and told the Petitioner that he needed "to get the hell out." The Petitioner left the apartment calmly without saying anything.

Ms. Belew testified that after the Petitioner left, she asked Mr. Perryman and Mr. Beavers to remain in the apartment while she finished her shower. Burgess, 2014 WL 309644, at *2. While she was in the shower, she heard another knock at the door and heard the Petitioner say, "'F--- you, mother f-----s'" followed by sounds she later realized were gunshots. Mr. Beavers came into the bathroom bleeding from a gunshot wound to his chest, told Ms. Belew that Mr. Perryman had been shot, and tried to hide in the closet. Ms. Belew heard Mr. Perryman calling for help, but she was unable to open the bathroom door. Mr. Beavers then used an electric guitar he found in the closet to smash a hole in the bathroom door, and Ms. Belew called 911 and attended to Mr. Perryman. Mr. Perryman eventually succumbed to his injury, which at autopsy reflected a fatal gunshot wound to the torso. Id. at *5.

On cross-examination, Ms. Belew acknowledged that she initially told police that the Petitioner had driven her to the new apartment and helped her move in her belongings. Burgess, 2014 WL 309644, at *2. She said that she changed her statement the following day and acknowledged that she blamed her initial mistake on the fact that she had consumed too much beer on the day of the incident.

Jordan Beavers, who was sixteen years old at the time of the June 2012 trial, testified that he, Mr. Keel, and Mr. Perryman arrived at Ms. Belew's apartment to find Ms. Belew wrapped in a towel and seated at the table talking to a heavyset man wearing a voluminous Hawaiian-print shirt, whom Mr. Beavers later identified as the Petitioner. Burgess, 2014 WL 309644, at *2. Mr. Beavers recalled that Mr. Perryman asked the Petitioner why he was in the apartment, and the Petitioner replied that he was delivering Ms. Belew's mail. Mr. Perryman cursed the Petitioner and told him to leave. According to Mr. Beavers, the Petitioner "just said, 'Okay,'" and left. No physical altercation occurred between the men.

---

[5] Ms. Belew did not discuss Mr. Keel during her testimony.

-3-

Mr. Beavers testified that while Ms. Belew was taking a shower, the three men heard a knock, and Mr. Perryman answered the door. Burgess, 2014 WL 309644, at *2. Mr. Beavers said that Mr. Perryman saw the Petitioner standing at the door, cursed at him, and asked why he had returned. The Petitioner replied that he had forgotten something, and he raised a gun and fired it at Mr. Perryman, who fell into the kitchen counter. After the Petitioner shot Mr. Perryman, he came into the apartment, pointed the gun at Mr. Beavers, and fired. Not realizing he had been shot, Mr. Beavers ran into the bathroom, where he hid in a closet. While he was in the bathroom, he heard Mr. Perryman plead for his life. Mr. Beavers testified consistently with Ms. Belew regarding his using a guitar to break through the bathroom door.

Mr. Beavers said that upon emerging from the bathroom, he left the apartment without checking on Mr. Perryman and saw Ms. Beavers and his girlfriend, Isabella Jacobson, waiting in Ms. Beavers's car. Burgess, 2014 WL 309644, at *3. Ms. Beavers drove toward the hospital, flagging down a police car on the way and alerting them to the situation at Ms. Belew's apartment. Mr. Beavers suffered a "through-and-through" gunshot wound to the chest.

On cross-examination, Mr. Beavers admitted that Mr. Perryman had told the Petitioner, "Get the f--- out. Before I beat your a--." Burgess, 2014 WL 309644, at *3. Mr. Beavers denied that Ms. Belew was arguing with the Petitioner when he initially arrived at the apartment. He affirmed that Ms. Belew asked Mr. Beavers not to call the police after the shooting.

Hunter Keel, who was fourteen years old at the time of the June 2012 trial, testified consistently with Mr. Beavers regarding the circumstances in which they initially encountered the Petitioner, including Mr. Perryman's cursing the Petitioner and telling him to leave. Burgess, 2014 WL 309644, at *3. Mr. Keel affirmed that the Petitioner left without comment. Mr. Keel noted that Mr. Perryman was not generally "nice" to anyone.

Mr. Keel also testified that when Mr. Perryman opened the door a short time later, the Petitioner claimed to have forgotten something, pulled out a gun, and shot Mr. Perryman. Burgess, 2014 WL 309644, at *3. Mr. Keel "shut the door and got on the ground." After he saw Mr. Beavers run into the bathroom, Mr. Keel ran out the front door. Mr. Keel heard an additional gunshot and believed the Petitioner was shooting at him. Mr. Keel eventually ran to Ms. Beavers's apartment and waited for the police to arrive before returning to Ms. Belew's apartment. Mr. Keel admitted that he "might have been dramatic" in his initial police statement, in which he relayed that he attacked the Petitioner with an object and that the Petitioner chased him out of the apartment and shot at him; he acknowledged that his trial testimony was "somewhat different" from the statement.

Nolan Pippen, a resident of the apartment complex, said that at approximately 1:00 p.m. on August 7, 2011, he saw "a very large man, very large proportioned man, who was unusual looking" and wearing a large "flowery" shirt go into Ms. Belew's apartment. Burgess, 2014 WL 309644, at *4. Mr. Pippen saw the man leave, and sometime later, he heard gunshots and saw a Caucasian teenager run out of Ms. Belew's apartment "like he was running a 100-yard dash."

Sixteen-year-old Isabella Jacobson[6] testified that she was outside Ms. Beavers's apartment when she saw the Petitioner walk to Ms. Belew's apartment door and knock; when someone opened the door, Ms. Jacobson saw the Petitioner's hand raise, and she heard gunshots. Burgess, 2014 WL 309644, at *4. The Petitioner entered the apartment, and Mr. Keel ran outside. Ms. Jacobson alerted Ms. Beavers, and they drove in Ms. Beavers's car toward the apartment complex parking lot. As Ms. Beavers drove Ms. Jacobson toward the parking lot, they saw the Petitioner, and Ms. Beavers asked him, "Did you just shoot my son and my brother?" The Petitioner responded, "No, I don't know what you are talking about." Upon arriving at Ms. Belew's apartment, Ms. Jacobson walked inside and saw broken glass and spilled beer on the floor. Mr. Perryman was on the floor holding his side; he asked her for help because he had been shot. Ms. Jacobson also saw Ms. Belew and Mr. Beavers inside the bathroom; upon realizing that Mr. Beavers had been shot, Ms. Jacobson and Ms. Beavers took him to the hospital.

Lewisburg Police Sergeant Jerry Broyles testified that at the crime scene, Ms. Belew was standing in the doorway wrapped in a towel. Burgess, 2014 WL 309644, at *5. She told him that the Petitioner had shot Mr. Perryman and Mr. Beavers and that the Petitioner had left the area. Sergeant Broyles later responded to a location in which the Petitioner was sitting in his car; after the Petitioner was arrested, another officer pointed out to Sergeant Broyles a Hawaiian-print shirt and a pistol inside the vehicle.

Lewisburg Police Detective James Johnson testified that he interviewed the Petitioner after the Petitioner had waived his rights; the Petitioner gave a written statement and a corresponding one-hour recorded statement. Burgess, 2014 WL 309644, at *5. In the written statement, the Petitioner recounted that a friend brought "some girl" to his apartment who needed a place to stay. He said that the woman stayed with him from Sunday to Friday and then left with "no goodbye or anything." The Petitioner wrote that when the woman would not answer his calls, he asked a friend where she had gone. The Petitioner went to that location, and a maintenance man told him where she was staying. He knocked on the door, and the woman told him to come inside and that she was in the shower. When he went inside, the two of them sat at a table discussing "forgiveness." The Petitioner described what happened next:

---

[6] Ms. Jacobson was also referred to by her full name in the direct appeal opinion in spite of her age.

-5-

Then some bad [M]exicans came and saw me the[y] said I was a FN cop and the[y] was going to kick my ass and kill me because I'm and [sic] pig he came at me with a beer bottle and called me more names then the others came at me the girl disappeared I put out my HIP380 cocked it and it did not matter they was going to kill me I shot at the . . . wall and the bathroom wall door area not aiming at anyone then I left and some chick called the cops.

After the conclusion of the State's proof, the trial court conducted a Momon colloquy, see Momon v. State, 18 S.W.3d 152, 161-62 (Tenn. 1999), after which the Petitioner elected not to testify, saying, "The statement made with the audio tape was good enough[.]" Burgess, 2014 WL 309644, at *5. The defense did not present any further proof. The jury convicted the Petitioner of the first degree murder of Mr. Perryman, the attempted first degree murder of Mr. Beavers, and the aggravated assault of Mr. Keel. However, the jury acquitted the Petitioner of the aggravated assault of Ms. Belew.

Relevant to the issues in this appeal, the Petitioner contended on direct appeal that the trial court erred by denying his post-trial motion to compel production of communications between the Petitioner and two jailers. Burgess, 2014 WL 309644, at *6-8. He averred that while he was being transported to a mental health facility after his arrest, he told the jailers that he saw a "shadow demon" inside the transport van. The Petitioner also stated that he told a woman at the mental health facility about his seeing shadow demons while the two jailers were in earshot. However, the Petitioner provided no testimony or proof that either conversation was memorialized in writing. This court concluded that the Petitioner "failed to make reasonable efforts to obtain the statements . . . or proof thereof" before filing the post-trial motion, such as subpoenaing the jailers in spite of knowing their names and where they worked. In addition, this court noted that the Petitioner did not qualify for relief under Tennessee Rule of Criminal Procedure 16 because his statements were not made in response to interrogation, and the Petitioner did not prove that the State intended to offer the statement in evidence at trial.

This court noted that at a post-trial hearing, the Petitioner sought to call defense investigator Loyce Payne as a witness to testify regarding Ms. Belew's statements to Mr. Payne about what the Petitioner told her about seeing shadow demons. Burgess, 2014 WL 309644, at *12. Mr. Payne was also expected to testify that Ms. Belew told him that the State threatened to "make things difficult" for Ms. Belew regarding pending criminal charges if she mentioned the shadow demons, instead urging her to testify that she moved out of the Petitioner's apartment due to his unwelcome romantic advances. The trial court excluded the testimony as inadmissible hearsay.

This court concluded that the Petitioner had not established a due process violation because the statement was immaterial and would not have changed the outcome of the

Petitioner's trial. Burgess, 2014 WL 309644, at *13-15. This court noted, "The [Petitioner] pursued a defense of self-defense and made no mention of any diminished capacity. Indeed, the only reference, oblique though it was, to the [Petitioner's] mental health, was Ms. Belew's testimony that she moved out because the [Petitioner] 'wasn't talking sense.'" Likewise, this court discussed that the Petitioner had not attempted to subpoena Ms. Belew to the post-trial hearing and that as a result, she was not unavailable for purposes of establishing a hearsay exception.

## II. Post-Conviction Proceedings

On October 28, 2014, the Petitioner filed a pro se petition for post-conviction relief, raising multiple grounds of ineffective assistance of trial and appellate counsel. Relative to trial counsel, the Petitioner argued that (1) counsel failed to file a motion to dismiss or object to the State's "[d]estruction" of exculpatory evidence bearing on the Petitioner's self-defense theory; (2) counsel "coerced" the Petitioner into choosing not to testify; (3) counsel failed to interview and call several witnesses at trial or sentencing, namely Dr. Jon Garrison, an unidentified expert witness on the side effects of Xanax, Ms. Belew, and a man name "T-Roy" and his wife "Blondie"; (4) counsel failed to subpoena the Petitioner's telephone records reflecting his calls to Ms. Belew; and (5) counsel failed to promptly withdraw due to a conflict of interest or to obtain a waiver of the conflict. Relative to both trial and appellate counsel, the Petitioner argued that they respectively failed to preserve the above-referenced issues or raise them on direct appeal.

The Petitioner also raised a due process issue related to the State's failure to collect as evidence discarded beer bottle fragments, arguing that because the police returned to Ms. Belew's apartment after taking the Petitioner's statement and photographed the fragments in Ms. Belew's garbage, the State "knew of the broken beer bottle's exculpatory nature and intentionally destroyed it in order to negate the Petitioner's claim of self-defense." See State v. Ferguson, 2 S.W.3d 912, 917 (Tenn. 1999). The Petitioner averred that "a reconstruction of" the bottle would have revealed Mr. Perryman's fingerprints, gunshot residue or stippling, and a hole in the bottle where the Petitioner had shot it; further, the Petitioner asserted that the bottle reconstruction would reflect the close proximity of the bottle to Petitioner and Mr. Perryman when Mr. Perryman was shot.

The post-conviction court appointed first post-conviction counsel on December 16, 2014, and the first post-conviction hearing took place on January 22, 2015. Post-conviction counsel did not amend the post-conviction petition.

### a. *First evidentiary hearing*

The Petitioner testified that the Public Defender's Office represented him in General Sessions Court, at his preliminary hearing, and throughout his trial in Circuit Court. The Petitioner stated that the first time he met trial counsel, he told counsel that he "shot the beer bottle next to the bathroom door and the wall." When the Petitioner received a copy of the discovery materials, he realized that the beer bottle fragments were not collected as evidence. The Petitioner averred that he told counsel the bottle was important because Mr. Perryman used the bottle to attack him. The Petitioner did not recall, though, whether he asked counsel to file a motion related to the fragments.

The Petitioner agreed that the crime scene photographs of the fragments were taken after Ms. Belew swept up and discarded them; he further agreed that beer visible on the floor in the photographs was consistent with the location in which the bottle fell. The Petitioner stated that Mr. Perryman "slung" the bottle at him, that the pistol touched the bottle, and that the Petitioner shot the bottle. The Petitioner asserted that the bottle fragments and beer from the bottle would have contained gunshot residue because according to the police, no gunshot residue was found elsewhere at the crime scene or on Mr. Perryman's body. The Petitioner stated that the fragments "could have been tested" and that the police knew the bottle was "part of [the Petitioner's] statement."

The Petitioner acknowledged that trial counsel could not have done anything to retrieve the bottle fragments or reassemble them, that the fragments were thrown away before he met counsel, and that he never asked counsel to file a motion to dismiss based upon the missing fragments. The Petitioner averred that the fragments would have proven his theory of self-defense because they would reflect that he "shot the beer bottle that was swung at [him]." The Petitioner thought that Ms. Belew testified at trial that the beer bottle fell on the floor.

The Petitioner testified that at trial, trial counsel talked to him for about thirty minutes about whether he would testify. According to the Petitioner, counsel told him that because he "had nothing entered on [his] behalf," the Petitioner "was probably going to get yelled at and stuff by [the prosecutor]" and that the Petitioner's written and audio-recorded statements were sufficient to prove self-defense. The Petitioner said that counsel recommended against his testifying because he "didn't have [any]thing else up there backing [him]." The Petitioner decided not to testify based upon counsel's recommendation. When asked whether he felt counsel "forced" him not to testify, the Petitioner stated, "I understood what they were saying when I didn't have [any]thing to back . . . up . . . what I would say on the stand." He agreed that the evidence was "[his] word versus the word of everybody else that was there." When asked whether his

-8-

credibility might have been enhanced by giving consistent accounts of events in comparison to witnesses' varying stories, the Petitioner responded negatively.

The Petitioner testified that trial counsel visited him in jail before the trial and told him that he could testify if he wanted to do such, although it would be the Petitioner's word against that of the witnesses. The Petitioner denied that counsel ever prepared him to testify. When asked how counsel "coerced" him into not testifying, the Petitioner said, "I took their advice . . . and I don't know the process that well[.]" The Petitioner noted that he did everything counsel told him to do.

The Petitioner testified that he wanted several witnesses called to testify at trial on his behalf. He said that "T[-]Roy," whose legal name he did not know, would have testified about why the Petitioner was parked "on the hill" and why he was carrying a gun. According to the Petitioner, T-Roy told the Petitioner that the Petitioner's transmission was going bad and that the Petitioner should "do all [his] running all at one time." The Petitioner noted that he had the pistol on the day of the shooting because he was taking it to his father's house for safekeeping after multiple burglaries occurred at the Petitioner's apartment complex.

The post-conviction court interjected and asked what difference the location of the car would have made to the Petitioner's self-defense argument. The Petitioner replied, "I guess it wouldn't matter, would it?"

The Petitioner testified that he saw Dr. Jon Garrison for two one-hour appointments before his trial. The Petitioner stated that at one jail visit, trial counsel conveyed Dr. Garrison's report that the Petitioner was "a little bit off"; counsel did not discuss Dr. Garrison's findings again or tell the Petitioner how they might help or hurt his defense. On December 24, 2014, the Petitioner saw for the first time a letter Dr. Garrison wrote to the parties and the trial court discussing diminished capacity. The Petitioner agreed that diminished capacity could "help your mental state down a level or two." The Petitioner stated that at his sentencing hearing, Dr. Garrison testified "that if you back somebody into a corner that they're going to defend themselves like [the Petitioner] had to." The Petitioner opined that had Dr. Garrison testified at trial, it might have made a difference to his case.

The Petitioner testified that he had been going to "Centerstone" for mental health treatment for more than one year before the shooting. He said that he saw "an elderly lady" and a man who prescribed him Bupropion and Xanax for anxiety. The Petitioner suffered from anxiety attacks in which he felt closed in, "like [he was] going to freak out," and as though he would have a heart attack. The Petitioner stated that he had clinical depression and anxiety and that he did not know whether Dr. Garrison reviewed his Centerstone records. The Petitioner averred that he told trial counsel about his taking Xanax on the day

of the incident and asked counsel whether it would help the defense if the Petitioner had "too much in [him]"; however, counsel were not "interested in that." The Petitioner stated that his mental health had improved somewhat since the shooting.

The Petitioner affirmed that he suffered a "closed head injury" in a 1999 automobile accident during which the Petitioner's head went "halfway" through his windshield after a car pulled in front of him and hit his vehicle. When asked whether the injury affected his ability to think, the Petitioner replied, "I don't know, it may have. I'd say, yes." Although the Petitioner thought that he "probably" told trial counsel about the accident and that the other driver died, he did not believe he told counsel about his mental health history and previous head trauma.

The Petitioner testified that he wanted trial counsel to question Ms. Belew at trial about their lack of a romantic relationship; he noted, though, that he did not know if this information was "actually relevant to self-defense." The Petitioner stated that he also wanted Ms. Belew questioned about the Petitioner's telephone call to her before the incident, noting that he did not have the ability to send text messages. The Petitioner opined that Ms. Belew lied about receiving text messages from him. He added that Ms. Belew knew he was coming to her apartment to drop off mail.

The Petitioner testified that Shawn Julian was the mutual friend who arranged for Ms. Belew to stay with the Petitioner. The Petitioner wanted Mr. Julian called as a witness because he could impeach Ms. Belew's testimony that she had not met the Petitioner previously; the Petitioner asserted that he met Ms. Belew at Mr. Julian's home one year prior to the incident. The Petitioner stated that he asked trial counsel to subpoena Mr. Julian as a witness, but that counsel did not do such.

The Petitioner testified that at the time he received the discovery materials, he was dissatisfied with trial counsel and did not believe they were "really doing anything to help" him. He elaborated that every time he told counsel his version of events, "they would be combative . . . about it" and that "[it] just seem[ed] like they didn't believe" the Petitioner. The Petitioner noted that counsel told him "well, they're going to say this and that if you go to trial." The Petitioner opined that counsel were not representing his interests. He said, though, that counsel visited him in jail when they had questions for him or wanted to tell him something.

The Petitioner testified that in early March 2012, three months before trial, trial counsel filed a motion to withdraw because the Public Defender's Office had also represented Mr. Beavers in an unrelated criminal case. According to the Petitioner, the prosecutor said at a hearing on the motion that the State "didn't mind" counsel's continuing to represent the Petitioner, and the trial court "agreed" with the State. The Petitioner was

not asked to sign a waiver of the conflict of interest. The Petitioner stated that at some point after the hearing, he asked counsel to "go back up and tell them to give [him] another lawyer" but that the District Public Defender refused. The Petitioner said that he wished he would have asked the trial court for another lawyer. Post-conviction counsel noted that during the motion to withdraw hearing, another defendant was "sitting back there and he asked for a different attorney and he got one."[7]

The Petitioner estimated that in an effort to obtain other counsel, he contacted between seventeen and twenty attorneys after asking jail staff for their contact information. However, he could not find another attorney to take his case, and he noted that it was difficult to retain an attorney while in jail with no money.

The Petitioner testified that the Public Defender's Office represented him through the end of his trial, that the Petitioner's family then hired appellate counsel, and that at an August 8, 2012 hearing,[8] the District Public Defender "and them quit [the Petitioner]." As a result, appellate counsel represented the Petitioner during his sentencing hearing and at the motion for new trial proceedings.

The Petitioner testified that appellate counsel did not subpoena Ms. Belew to the sentencing hearing; according to the Petitioner, at some point, Ms. Belew informed appellate counsel that the Petitioner told her about seeing shadow demons. The Petitioner denied, though, that he saw shadow demons at the time of the shooting.

Relative to the Petitioner's statement to police that "bad Mexicans" attacked him, the Petitioner testified that as he approached Ms. Belew's apartment he saw three people in the parking lot who "looked like Mexicans[.]" The Petitioner noted that the discovery materials reflected Mr. Perryman's having had cirrhosis, which had altered his skin tone. The Petitioner further described Mr. Perryman as having "a fu manchu, like thing going on, and he was tatted down both sides, and tattoos down both sides of him, and he looked like he was Hispanic." The Petitioner asserted that appellate counsel should have introduced a photograph of Mr. Perryman to show why the Petitioner thought he was Mexican and in order to "have a better understanding of what [the Petitioner] was up against that day." The Petitioner expressed his belief that Ms. Belew stole his prescription

---

[7] It was unclear to whom post-conviction counsel was referring here, but it appears to be a person who was not involved in the Petitioner's case.

[8] The Petitioner referred to this hearing as a sentencing hearing; the August 8 hearing transcript is not included in the record on appeal. However, the record reflects that the Petitioner's sentencing hearing was conducted in two portions; the initial October 10, 2012 hearing was continued in order to secure Dr. Garrison's presence to testify at a subsequent November 7, 2012 hearing. Neither of the sentencing hearing transcripts contains discussion of trial counsel's withdrawing from the Petitioner's case.

medication, that she knew he had "extras that she didn't get," that she told him to come to the apartment in order to set him up for a robbery, and that Ms. Belew arranged for the men to come inside, attack the Petitioner, and take his medication and money.

The Petitioner testified that appellate counsel never discussed with him filing an appeal to the Tennessee Supreme Court after his direct appeal was denied. The Petitioner noted that he "had to" communicate with counsel through the Petitioner's family members and that he had no personal conversations with counsel after they met in court. The Petitioner affirmed that he did not sign a written waiver relative to a Rule 11 appeal and that no Rule 11 appeal was filed. The Petitioner also noted that counsel never informed him that counsel was withdrawing or that counsel was not responsible for filing a Rule 11 appeal.

The Petitioner testified that he filed a complaint with the Board of Professional Responsibility regarding appellate counsel's failure to respond to a letter in which the Petitioner requested a copy of his file. Thereafter, counsel sent the Petitioner a letter and provided the file to the Petitioner's family.

On cross-examination, the Petitioner acknowledged that his testimony differed from his police interview, and he noted that he "added to it." The Petitioner stated that Mr. Keel was Caucasian, and Mr. Beavers had "light brown" skin or was biracial. The Petitioner did not know whether Ms. Belew discarded the bottle fragments before the police arrived. The Petitioner reviewed his written statement and agreed that it established how he knew Ms. Belew. The Petitioner said that when he arrived at Ms. Belew's apartment, he had a sixteen-ounce can of beer. He agreed that Ms. Belew testified at trial to "fussing at" him and telling him to leave, as well as refusing to become his girlfriend.

The Petitioner acknowledged Mr. Pippen's testimony that he saw the Petitioner walking away from Ms. Belew's apartment and later heard gunshots, as well as Isabelle Jacobson's testimony that she saw the Petitioner knock on Ms. Belew's door and heard gunshots immediately afterward. The Petitioner denied that these respective events occurred.

The Petitioner read his written statement aloud, and he added that after Ms. Belew "disappeared," the Petitioner pulled out his gun; he added that the three men surrounded him. When asked whether he told police that he had time to pull out the gun and chamber a round, the Petitioner said,

> When I was sitting there, and they came in, Perryman, the first thing he said to me was, cop, pig. He called me like [fourteen] different names. Then, Belew was sitting at the other side of the table. He goes over by [Ms.] Belew,

and he's like right behind her. He has a Colt 45 beer bottle in one hand and a cigarette in the other, and he looks right at me and says, I'm going to beat you to death and throw your body into the Duck River, and you'll be lucky if you're ever found.

. . . .

Okay. He said that to me, and then he leans over and puts his cigarette out and says, leave, [b--ch]. I thought he was talking to me. I said I don't want no problems . . . . And [he] like moves back. She disappears. She went into the bathroom is what she did[.]

The Petitioner stated that he believed the men were going to kill him and that he "shot at the bottle" after the bottle made contact with the barrel of the pistol. Upon questioning by the post-conviction court, the Petitioner opined that the bottle broke when he shot it, but he acknowledged that the bottle "might have shattered even if [he] didn't shoot it" when the bottle touched the pistol.

The Petitioner agreed that he gave his written statement on the day of the incident, including his claims that he acted in self-defense and that he did not leave the apartment and return. When asked whether it made sense for a defense lawyer to argue alternative theories of self-defense and diminished capacity, the Petitioner replied that it "would be a smart thing." The prosecutor then attempted to explain why diminished capacity was incompatible with a theory of self-defense, but the Petitioner did not understand this line of questioning.

Relative to the Petitioner's asking appellate counsel about filing a Rule 11 appeal, the Petitioner testified that his parents communicated to him counsel's response that the Petitioner could file one if he desired, but that "only five get accepted a year, so it might not make a difference to do it." The Petitioner said that appellate counsel did "everything" that the Public Defender's Office "should have" done, although the Petitioner was unhappy that appellate counsel did not subpoena Ms. Belew to the sentencing hearing. The Petitioner said that if Ms. Belew had testified regarding the Petitioner's mental illness at the sentencing hearing, it "might have made a difference, [or] it might not have."

The Petitioner reiterated that he wanted the Tennessee Bureau of Investigation and police detectives to reconstruct the broken beer bottle and test it for gunshot residue because the beer might not have washed any such residue off the glass fragments. The prosecutor asked the Petitioner if he knew whether a method existed by which such testing was possible, but the Petitioner did not understand the question.

The Petitioner testified that during trial, he told trial counsel that he wanted to testify to "clear up some stuff." The Petitioner acknowledged the trial court's <u>Momon</u> colloquy and his answers under oath. The Petitioner noted that he "tried to talk to" the trial court about the issue but could not; he admitted, though, that the occasion to which he referred did not occur at the time of the colloquy.

The Petitioner testified that he wanted trial counsel to ask Ms. Belew additional questions during her testimony. When asked whether he understood why counsel might have declined to question Ms. Belew if counsel knew her answers would contradict the Petitioner's police statements, the Petitioner replied that at the time he gave his police statements, he was "freaked out." He acknowledged, though, that he told the police "what happened," including his shooting the beer bottle.

Relative to Mr. Julian, the Petitioner averred that Ms. Belew told the Petitioner that she was a lesbian and that Mr. Julian's testimony on this point would have undermined the State's theory that the shooting arose from a "love-triangle." The Petitioner stated that during the sentencing hearing, Dr. Garrison "said [the Petitioner] had a ground to argue" diminished capacity. The Petitioner agreed, though, that Dr. Garrison made no statement about whether he would have testified at trial in support of the Petitioner's diminished capacity.

The sentencing hearing transcript, which was received as an exhibit, reflected that at the hearing, Dr. Garrison acknowledged his November 7, 2011 letter assessing the Petitioner's competency to stand trial, including a statement that the Petitioner "[did] appear to have a basis for a claim of diminished capacity." Dr. Garrison agreed that the letter reflected the "standard" matters he addressed in response to an order for a psychological evaluation. When asked to elaborate on his statement regarding diminished capacity, Dr. Garrison responded, "I am saying it is potentially an issue. I am not concluding he has diminished capacity. I am saying he has an issue that needs to be argued." Dr. Garrison agreed that the prosecutor visited him before trial to discuss the Petitioner's case. He stated that if he were able to modify the statement about diminished capacity, he would have written that the Petitioner had a "basis for arguing diminished capacity, not concluding diminished capacity, but at least arguing it." Dr. Garrison explained that he based his opinion upon the Petitioner's having two "Axis I" diagnoses; according to Dr. Garrison, another practitioner at Centerstone diagnosed the Petitioner in December 2010 with "agoraphobia, with panic disorder, and also major depression or depressive disorder, recurrent severe, with no mention of psychosis." Dr. Garrison noted that the Petitioner's diagnoses predated the shooting incident. Dr. Garrison opined that his assessment of the Petitioner's potential diminished capacity was "conservative" and based upon Dr. Garrison's finding enough "evidence" to "allow the defense attorney to make the argument if they choose to."

On cross-examination, Dr. Garrison testified that he also concluded that the Petitioner had a "personality disorder" that probably resulted from "his upbringing" and subsequent experiences; he noted that the Petitioner reflected "a lack of social interactions and a lack of social skills[.]" Dr. Garrison declined to render an opinion of the Petitioner's "mental development," and he commented that he knew of no test to determine a patient's mental "age."

Appellate counsel testified at the post-conviction hearing that he began practicing law in Spring 2011, that he ran for District Public Defender in 2014, and that he represented the Petitioner for his sentencing hearing, motion for a new trial hearing, and direct appeal. Counsel noted that he was "not really allowed to raise ineffective assistance on direct appeal, [and] that's mostly what this case [was] about." Counsel stated that upon reviewing the trial record, "the most glaring thing" he noticed was "a golden Easter egg that came out of Centerstone," Dr. Garrison's evaluation. According to counsel, Dr. Garrison thought the Petitioner's "mental condition was so bad that Dr. Garrison actually included in his report that" the Petitioner had diminished capacity. Counsel noted that in his experience, such a statement was rare in a competency determination, and he posited that Dr. Garrison "sort of sua sponte . . . threw that in." Appellate counsel opined that trial counsel's failure to "explore that avenue . . . was really glaring."

Appellate counsel testified that Dr. Garrison offered "very favorable" testimony at either the sentencing or motion for a new trial hearing, although he could not remember at which hearing Dr. Garrison testified. Counsel noted that he was "very impressed" with Dr. Garrison and opined that Dr. Garrison would have been a "great witness for the jury." Counsel stated that he had a "huge amount" of the Petitioner's medical records from Centerstone; however, he did not recall whether he entered them into evidence at the sentencing hearing. Appellate counsel stated that although the records were relevant to proving diminished capacity, in light of the fact that trial counsel's defense strategy did not involve diminished capacity, the records would not have been useful. When asked whether self-defense and diminished capacity could be presented together as a joint defense, appellate counsel replied,

> Absolutely. As a matter of fact, that is common even because the whole question really is because we're dealing with self-defense . . . we want to know this particular person, this particular situation. We deal commonly with post-traumatic stress clients. We want to know that particular person that particular situation, that particular time did they have some basis. So, when we talk to the jury, it's very common that we weave those two together, yes.
>
> . . . .

In this particular case, to be clear about this, I think it would have been a mistake to do either without the other . . . . [The Petitioner was] very consistent the entire time. The facts made out a case for self-defense. And then, after you do the basic due diligence that any trial counsel or criminal defense counsel did with respect to [the Petitioner's] background, then his mental health problems . . . just jumped out -- so, I really think that if you had pursued either strategy in isolation of that, the effectiveness would have been much more limited.

Appellate counsel testified that although it was his opinion that Dr. Garrison "needed to talk to a jury," he was not called as a witness. Counsel also recalled that "agents of the State" were aware of the Petitioner's "serious delusions" involving seeing "demons" before the trial; counsel noted that this issue should have been raised before trial.

Relative to the beer bottle fragments, appellate counsel testified that before he filed the motion for a new trial, he was aware that the bottle was not collected as evidence. Nevertheless, counsel did not raise an issue in the motion for a new trial or on direct appeal regarding the bottle.

Appellate counsel did not recall discussing with the Petitioner his decision not to testify, although counsel acknowledged that he "spent a lot of time talking to" the Petitioner and that such a conversation may have occurred. Appellate counsel disagreed that the Petitioner would have been better served by trial counsel's continuing to represent him through the sentencing and motion for a new trial proceedings.

Appellate counsel testified that he did not file a Rule 11 appeal in the Petitioner's case and that he did not recall obtaining a waiver from the Petitioner. He similarly did not remember whether he filed a motion in this court to withdraw as counsel. When asked whether he sent the Petitioner a letter explaining the Rule 11 appeal process, counsel did not recall sending any letters to the Petitioner or speaking to the Petitioner on the telephone after the Petitioner was transferred to prison. Counsel noted that he communicated with the Petitioner's family members "daily." Counsel stated that if he was required to file a Rule 11 appeal "and . . . didn't do it, then, yeah, it's definitely an error."

On cross-examination, appellate counsel testified that as of the date of the post-conviction hearing, he had handled seven or eight criminal trials; none of the trials resulted in acquittal for his clients or involved diminished capacity, self-defense, or a murder charge. Counsel did not recall ever speaking with Dr. Garrison. Counsel acknowledged that he had never tried a case in which he argued both self-defense and diminished capacity; he noted, however, that this fact "in no way change[ed] . . . what should have been done."

-16-

Relative to Ms. Belew's not having testified at the sentencing hearing, appellate counsel testified that he "tried desperately" to call Ms. Belew at every hearing and that he "spent days of everyone in our office searching all over Marshall County looking for [Ms.] Belew." Appellate counsel stated that although he spoke with Ms. Belew at "great length" prior to the sentencing hearing and considered her "the linchpin of this case," he was unable to subpoena her to court. Appellate counsel noted that Ms. Belew was "apparently homeless at the time." Appellate counsel did not recall when he informed the Petitioner that Ms. Belew could not be located.

Appellate counsel denied doing anything improper at the Petitioner's sentencing hearing that would have affected the outcome of the case. Appellate counsel stated that he had about one hundred clients who had been treated at Centerstone and that Dr. Garrison had not mentioned diminished capacity in any of those reports except for the one in which he assessed the Petitioner. Appellate counsel stated that it would surprise him to learn that Dr. Garrison often mentioned diminished capacity in his reports.

A copy of Dr. Garrison's letter to the trial court was received as an exhibit and reflected that the Petitioner was competent to stand trial and that he was not experiencing a severe mental disease or defect that caused him to be unable to appreciate the wrongfulness of his actions. However, Dr. Garrison noted, "The [Petitioner] does appear to have a basis for a claim of diminished capacity." Appellate counsel did not recall whether he asked Dr. Garrison if he could "support diminished capacity."

Appellate counsel testified that the Petitioner filed a complaint against him and that counsel sent his entire file to the regulatory body, possibly after the "time frame had run out on the appeal[.]" Appellate counsel stated that he did not customarily save form letters to clients on his electronic system because the letters "[took] up too much data space."

At this juncture, the State moved to continue the proceedings relative to appellate counsel's testimony in order to subpoena the Petitioner's file from "Lincoln County" and allow appellate counsel to search his computer system for records of his communication with the Petitioner. The State noted that it was not informed of the Rule 11 issue until the day of the hearing. With the Petitioner's agreement, the post-conviction court granted the State's motion.

Continuing with further testimony, trial counsel[9] testified that he had been an Assistant Public Defender for "several years" and had performed numerous jury trials. He stated that after he was appointed to represent the Petitioner in General Sessions Court, the

---

[9] Only one of the Assistant Public Defenders assigned to the Petitioner's case testified at the post-conviction hearing. For efficiency, we will refer to him as "trial counsel" here, although in other portions of the testimony and this opinion we have used the term collectively to refer to the Petitioner's defense team.

-17-

Petitioner mentioned seeing shadow demons; as a result, counsel requested a mental evaluation. Counsel said that he received Dr. Garrison's letter and that he discussed the letter with the Petitioner and mailed him a copy. Although counsel initially stated that his office sent "copies of everything" to the Petitioner, counsel later stated that as a result of an "oversight," Dr. Garrison's letter was not mailed to the Petitioner. Counsel maintained, however, that he specifically discussed the letter with the Petitioner. Counsel recalled that during this conversation, counsel told the Petitioner that "insanity was not supported" and that he was competent to stand trial. Counsel also explained "the diminished capacity issue," which he agreed was a difficult concept for clients to understand. Counsel also agreed that diminished capacity was difficult to prove to a jury.

Trial counsel said that either he or another member of the defense team spoke to Dr. Garrison, although they did not visit him in person. Trial counsel did not think that the defense team requested the Petitioner's Centerstone records or contacted his mental health practitioners, and he noted that "from the beginning" they focused on self-defense.

Trial counsel testified that the Petitioner filed a "board complaint" against his office regarding "his discovery and his file." In response, counsel sent the Petitioner and the board "copies of letters of everything that we had stating . . . what we had sent in." Counsel did not recall whether Dr. Garrison's letter was included in those materials.

Trial counsel agreed that he did not argue diminished capacity in the Petitioner's case. Counsel agreed that in some cases, a person with diminished capacity could be in unreasonable fear for his life. When asked whether counsel could "weave" diminished capacity into a self-defense argument to explain the Petitioner's behavior before and after the shooting and his statement about "Mexicans," counsel said that the Petitioner's police statements made no mention of shadow demons or feeling anxious. Counsel recounted the Petitioner's statement indicating that he acted in self-defense when three individuals threatened him and tried to hit him with a bottle. Counsel did not recall the Petitioner's making strange statements to the police about an impending war and Social Security's "fixing to go bankrupt."

Trial counsel testified that they "of course" considered having the Petitioner testify at his trial. Counsel averred that the Petitioner was incorrect when he stated that counsel never prepared him to testify. Counsel said that every time the defense team visited the Petitioner in jail, they questioned him about his version of events and "were going through essentially direct examination" and that they also asked the Petitioner "harder questions" to prepare him for cross-examination. Counsel stated that although the Petitioner had no previous criminal record, he would not have been a good witness because he had "inconsistencies in his story. When [trial counsel] would ask him about his inconsistencies,

-18-

he would shift his story . . . and then create another inconsistency or even . . . change what he stated all together." Counsel elaborated,

> For example, one of the things was the bottle and the gun, and [at] one point, [the Petitioner] would state that, I'm a terrible shot, so I could not have possibly been intending to kill these people, because I'm such a bad shot, it was an accident that I hit them in the first place. But, then the next sentence would be, but I shot the bottle out of his hand. So, all of a sudden he becomes a trick-shot artist.

> But, then when you point that out, . . . the story will become, well, when he swung the bottle, he hit the gun and knocked it down and that's what caused the bullet to hit him. On cross[-]examination, we had real concerns that his story would fall apart in the eyes of the jury.

Counsel stated that the Petitioner's police statements "covered the set up" of a self-defense argument and that at trial, they argued that the Petitioner's identification of Mr. Perryman, Mr. Beavers, and Mr. Keel as "Mexicans" was explained by the Petitioner's unfamiliarity with the men and their general skin tones. Counsel noted that the Petitioner's statement "was not some paranoid delusion. It[ was] a mistake of who they were." Counsel denied that the defense team threatened the Petitioner or forced him not to testify. Counsel stated that after the State closed its proof, they discussed with the Petitioner the evidence presented, the Petitioner's police statements, the arguments the defense could make based upon the statement, and counsel's concerns about the Petitioner's testifying.

Trial counsel testified that he did not recall Mr. Beavers's having been charged in an unrelated criminal case[10]; counsel noted that "[w]e didn't represent [him] on that case." Counsel affirmed that "from the beginning," the Petitioner discussed the beer bottle fragments and his wish that the fragments had been collected. Counsel stated that he filed no motion relevant to the bottle because in his opinion, any such motion would have been frivolous. Counsel noted that when the police arrived, the bottle had already been swept up and discarded and that the police photographed the fragments in a garbage can. Counsel stated that the police "made a point" to document the bottle and that the defense was able to argue that the bottle's presence was consistent with the Petitioner's version of events.

---

[10] Post-conviction counsel suggested to trial counsel that Mr. Beavers's criminal case occurred in 2013. The Petitioner's trial, sentencing hearing, and motion for new trial hearing were all conducted in 2012. Other testimony regarding the conflict of interest indicated that the Public Defender's Office concluded its representation of Mr. Beavers before the Petitioner's June 2012 trial. However, the record does not contain any information regarding when the motion to withdraw hearing occurred or the motion itself.

Upon examination by the post-conviction court, trial counsel testified that the Petitioner's police statements included discussion of the bottle and that the witnesses' testimony indicated that Mr. Perryman did not strike the Petitioner with a bottle. To counsel's recollection, Ms. Belew testified that Mr. Perryman had a bottle in his hand, although counsel did not recall whether Ms. Belew conveyed how or when the bottle fell to the floor.

On cross-examination, trial counsel testified that the Petitioner was arrested within one hour of the shooting and that in his police statement, the Petitioner only mentioned shooting the bottle, not touching the bottle with his pistol. Counsel affirmed that the Petitioner conveyed to the police his belief that he did not shoot anyone in the apartment. Counsel stated that at the time of the Petitioner's trial, he had tried more than thirty cases, "multiple" of which resulted in acquittals. Counsel agreed that he discussed the defense strategy with his co-counsel, including self-defense and diminished capacity. Counsel said that they also discussed diminished capacity with the Petitioner and its potential usefulness in obtaining a conviction for a lesser-included offense, but that the Petitioner "was not interested in that" and was "dead set" on arguing self-defense. Counsel noted that although the Petitioner's police interview contained "some odd statements," the Petitioner set out "a straight self-defense" account of events. Counsel stated that at trial, Mr. Beavers admitted on cross-examination that Mr. Perryman had threatened to "kick [the Petitioner's] a--."

Trial counsel testified that the defense team explored a potential diminished capacity argument by telephoning Dr. Garrison. Counsel stated that after speaking to Dr. Garrison, he did not feel that Dr. Garrison would have helped the Petitioner's case. Counsel said that the Petitioner had "agoraphobia and panic attacks," for which he took medication, and that the Petitioner mentioned having a beer in Ms. Belew's apartment, which counsel did not find to "provide a very strong argument" for diminished capacity. Counsel opined that the Petitioner's police statements provided the strongest self-defense argument. Counsel agreed that in Tennessee, diminished capacity was not, standing alone, a defense to guilt. He said that the Petitioner appeared to understand the concept of diminished capacity after they discussed it. Counsel stated that the Petitioner had always agreed with the self-defense theory.

Trial counsel averred that relative to the Petitioner's testifying, counsel was concerned that in light of the fact that the Petitioner did not experience mental health symptoms during the shooting, his bringing up his mental health issues would confuse the jury. Counsel noted that if the Petitioner had discussed shadow demons or his mental health issues during his testimony, counsel would have called Dr. Garrison as a defense witness. Counsel stated that he believed a self-defense argument was stronger and easier for the jury to understand.

Trial counsel testified that in his opinion, the defense team handled the Petitioner's case as best it could given the circumstances. Counsel did not believe that forensic analysis of the broken beer bottle would have changed the outcome of the trial, and he noted the Petitioner's hearing testimony that the bottle might have broken when it hit the pistol rather than having been shot. Counsel stated that the defense argued generally that the presence of the broken bottle at the crime scene supported the Petitioner's version of events.

Trial counsel testified that relative to Ms. Belew's testimony, the Petitioner was "very hung up on" whether he spoke to Ms. Belew before arriving at her apartment. Counsel stated that co-counsel cross-examined Ms. Belew and that although counsel did not recall if co-counsel questioned Ms. Belew on this point, counsel felt that co-counsel's cross-examination was "very effective" and "put some big holes into her story." Counsel noted his belief that as a result of co-counsel's cross-examination, the jury acquitted the Petitioner of aggravated assault relative to Ms. Belew.

Trial counsel testified that relative to T-Roy's proposed testimony, the location in which the Petitioner parked his car was of no consequence to his case. Counsel noted that the Petitioner wanted to impeach Ms. Belew's statement that he parked in front of her apartment. Counsel agreed that the Petitioner's police statements indicated that he parked in front of a tire shop and that part of the State's premeditation argument was that the Petitioner walked back to his truck to retrieve the gun.

Relative to the motion to withdraw filed prior to the Petitioner's trial, trial counsel testified that another attorney in his office represented Mr. Beavers in a Bedford County case; after the case was closed, the attorney realized that Mr. Beavers was also a witness in the Petitioner's case. Trial counsel did not discuss the Petitioner's case with the attorney, and he did not believe that the attorney discussed it with co-counsel or the District Public Defender. Counsel stated that they filed a motion to withdraw based upon the appearance of impropriety; he noted, however, that the conflict "ran more towards Mr. Beavers rather than [the Petitioner], because [they] were in a position . . . where [they were] going to have to cross[-]examine [Mr.] Beavers and there could be an appearance [they] would be potentially using inside information against him." Counsel said that he explained the conflict in these terms to the Petitioner multiple times and that the trial court found that no conflict existed and denied the motion to withdraw. Counsel did not recall the Petitioner's expressing any concern about the conflict, although counsel acknowledged that it was a confusing issue.

Trial counsel testified that generally, during a jail visit at a date close to trial, he would have explained to the Petitioner the right to testify, the State's evidence, the expected witnesses' testimony based upon defense interviews with the State's witnesses, and the Petitioner's police statements. Counsel stated that they interviewed every witness apart

from Ms. Jacobson. Counsel stated that the Petitioner appeared to understand the discussions about what would happen if he testified and in which counsel "test[ed] his ability" to be a witness. Counsel noted that he always advised clients to decide whether to testify after the close of the State's proof so that counsel could give the client a better-informed opinion about the desirability of testifying. Counsel said that at the close of the State's evidence, he advised the Petitioner that the defense team was able to "poke several sizeable holes" in the witnesses' testimony, which gave them room to argue self-defense, along with the police statements and the photograph of the broken bottle. Counsel also advised the Petitioner of his concern that inconsistencies would arise during direct or cross examination, that it was in the Petitioner's best interest not to testify, and that the decision was ultimately the Petitioner's. Counsel affirmed that the Petitioner understood the conversation. Counsel denied that he ever told the Petitioner that the prosecutor would "holler at" him; counsel stated that he told the Petitioner that the prosecutor would "try to get him angry" or confuse him.

Upon examination by the post-conviction court, trial counsel affirmed that the defense team's telephone call to Dr. Garrison occurred in advance of trial and that counsel could have subpoenaed Dr. Garrison as a trial witness if his testimony would have been favorable to the Petitioner's case. Counsel stated that the fact that the Petitioner was taking anxiety medication made it difficult to argue to the jury that he was "having some kind of mental attack" during the shooting.

### b. *Second evidentiary hearing*[11]

At the second evidentiary hearing on March 13, 2015, post-conviction counsel stated that consistent with the post-conviction court's instructions, she brought the Petitioner's complete file to the hearing. She averred that this file only reflected one letter from appellate counsel to the Petitioner.

In the context of explaining why two representation agreements existed in the Petitioner's case, appellate counsel testified that because the Petitioner had "a very strong diminished capacity situation," which had been described to counsel by "everyone" as the Petitioner's having "the approximate mentality of like a [twelve] or [thirteen]-year-old,"

---

[11] The second post-conviction hearing dealt mostly with appellate counsel's failure to file a Rule 11 appeal. The post-conviction court found that appellate counsel was ineffective in this regard and granted a late-filed Rule 11 appeal. The Petitioner raises the Rule 11 issue again in this appeal; however, because the post-conviction court granted post-conviction relief relative to the Rule 11 issue and our supreme court accepted and considered the late-filed Rule 11 application for permission to appeal, as we address in our analysis below, the Petitioner has already received the relief to which he was entitled. For the sake of clarity and efficiency, we will omit the majority of appellate counsel's testimony addressing the Rule 11 issue except where the testimony is also relevant to another issue raised on appeal.

counsel had the Petitioner's stepmother sign an agreement in his office in addition to the one the Petitioner signed in jail. Counsel stated that the Petitioner repeatedly asked counsel to explain concepts to his stepmother when the Petitioner did not understand them and that "whenever [counsel] explained things, they didn't stay explained."

The post-conviction court stated that it would issue a written order and that it had reached "a mixed conclusion." The court found no deficiencies in trial counsel's representation. However, the court found that appellate counsel's performance was deficient, and the court granted the Petitioner a late-filed Rule 11 application for permission to appeal to our supreme court.

### c. *Post-conviction court's memorandum opinion and first order*[12]

On August 25, 2017, the post-conviction court filed a memorandum opinion, recounting the issues raised, including the Rule 11 appeal issue orally raised during the hearings.

Relative to the Rule 11 appeal issue, the post-conviction court noted its oral "decision to dismiss the Petition as to all grounds except the Rule 11 relief" and its decision to grant a late-filed application for Rule 11 review. The court noted that upon further research, post-conviction counsel reported to the court off the record that the late-filed appeal should be allowed to proceed with consideration of the remaining issues stayed pending resolution of the Rule 11 appeal.

The post-conviction court found that although appellate counsel denied having been retained or appointed to represent the Petitioner for the sentencing hearing, counsel also testified that the trial court "asked" him to come into the case early. The court found that the Rules of Professional Responsibility governing general withdrawal from a representation applied to counsel. See Tenn. R. Sup. Ct. 8, RPC 1.16(b), (d). The court noted that the representation agreement the Petitioner signed stated "for 'appeal only'" and did not specify whether the appeal at issue was limited to the Court of Criminal Appeals; the Petitioner did not see or sign the other representation agreement signed by his stepmother. The court found that the Petitioner attempted unsuccessfully to file a pro se Rule 11 notice of appeal, which was rejected as a Rule 3 appeal by the appellate court clerk.

---

[12] The first post-conviction court focused its analysis in the memorandum opinion on the Rule 11 issue and made only limited findings of fact relative to the remaining issues. Although the second post-conviction court stated that it adopted the first post-conviction court's findings in its consideration of the Petitioner's remaining issues, the second post-conviction court provided expanded and more complete findings of fact and conclusions of law. For efficiency, we will only recount the first post-conviction court's findings as they relate to the Rule 11 issue.

The post-conviction court found that in response to appellate counsel's assessment of the Petitioner's "severely diminished capacity," counsel "relied on the family members, non-attorneys, to explain matters to the client" without counsel's participation or knowledge of what was conveyed. The court stated that although counsel claimed not to be aware of the Petitioner's letter requesting advice on how to proceed with the Rule 11 appeal, "it was uncovered in [counsel's] own file when the file was turned over to [post-conviction] counsel." The court noted that when "pressed by the Consumer Assistance Program to provide the client the file, [counsel,] without the permission of the [Petitioner], turned over the entire file" to the Petitioner's parents. The court concluded,

> Given [the Petitioner's] intellectual limitations, given the wording of the only representation contract that [the Petitioner] had signed, given the failure to obtain a written waiver of the desire to waive application for Rule 11 review, given [the Petitioner's] expression in writing of a desire to seek Rule 11 review, and given the fact that the failure by [counsel] promptly to provide [the Petitioner] with a copy of his court file would have hampered [the Petitioner] in requesting Rule 11 review on his own, then [counsel's] failure to apply for [R]ule 11 relief on [the Petitioner's] behalf fell below the acceptable standard for a criminal defense attorney.

The post-conviction court concluded that the Petitioner was entitled to a late-filed Rule 11 application for permission to appeal. The court stayed the post-conviction proceedings until our supreme court acted upon the late-filed application. The court entered a separate August 25, 2017 order entitled "Order Granting Partial Post-Conviction Relief and Stay," which stated that the court "found that for the reasons set out in the attached Memorandum Opinion, the relief set out below should be granted, and . . . the Petitioner is granted a late-filed application for Rule 11 review to the Tennessee Supreme Court."

*d. Rule 11 proceedings*

The Petitioner subsequently late-filed a Rule 11 application for permission to appeal to our supreme court. Our supreme court granted the motion to late-file the application in the interest of justice, considered the application for permission to appeal, and denied it. See State v. Phillip Matthew Burgess, No. M2013-00252-SC-R11-CD (Tenn. Jan. 24, 2019) (order denying application).

### e. *Motion to Produce Evidence*

On January 30, 2019, the Petitioner filed a pro se motion to produce evidence.[13] According to a March 19, 2019 order denying the motion, the Petitioner sought to "produce a timely filed" Rule 11 application or a petition for post-conviction relief. Judge Burk, acting as the post-conviction court, reviewed the motion and found that the Petitioner's avenues for Rule 11 and post-conviction relief had been "exhausted." The court incorrectly noted that the August 24, 2017 order granting partial post-conviction relief "dismissed" the Petitioner's remaining post-conviction issues, and the court concluded that "due to the fact that all relief prayed for in the [Petitioner's] previously filed Petition for Post-Conviction Relief has been satisfied . . and/or dismissed this matter is hereby CONCLUDED."

The Petitioner subsequently filed a pro se notice of appeal on April 17, 2019; this court observed in a May 6, 2019 order dismissing the appeal that it was unclear from the post-conviction court's order whether it complied with Tennessee Supreme Court Rule 28, section 9(D), which provides that after unsuccessfully pursuing a delayed appeal, a petitioner should be permitted to amend his post-conviction petition to include any new issues arising during the appeal and that the post-conviction court should lift the previously-imposed stay in order to hear "any remaining grounds" raised in the post-conviction petition. Although the Petitioner did not have a right to appeal the post-conviction court's denial of his motion to produce evidence, this court noted that the Petitioner could appeal from any final post-conviction order if the post-conviction proceeding remained active.

On August 26, 2019, in accordance with this court's order, the post-conviction court acknowledged in a written order that the previous post-conviction court had stayed consideration of the remaining issues raised in the post-conviction petition. The court ordered that the first post-conviction hearing be transcribed to facilitate review of the remaining post-conviction issues, relieved second post-conviction counsel, appointed third post-conviction counsel, and set a hearing date at which the Petitioner could raise any additional issues.

### f. *Third evidentiary hearing*

At a November 8, 2019 hearing, the post-conviction court commented that the previous court's memorandum opinion adequately addressed the post-conviction issues and that the current court would draft a new order dismissing the post-conviction petition in order to facilitate appellate review. The court found relative to the Rule 11 issue that the Petitioner received a late-filed appeal and that he consequently was not prejudiced by

---

[13] The pro se motion was not included in the record.

appellate counsel's deficiency. The court noted relative to the remaining issues that it would adopt the previous court's findings. When asked whether the Petitioner had additional issues to raise, third post-conviction counsel indicated that the Petitioner was unhappy with the amount of time it took the first post-conviction court to issue its memorandum opinion and for first post-conviction counsel to provide the Petitioner with his file. The State responded that the Petitioner received his Rule 11 appeal notwithstanding any delay.

### g. *Post-conviction court's second order*

The post-conviction court's December 20, 2019 written order found relative to the beer bottle issue[14] that law enforcement "took no part in removing or altering" the bottle fragments and that the witnesses' testimony indicated that Mr. Perryman was not carrying a bottle when he answered Ms. Belew's door. The court noted that the Petitioner's version of events was communicated to the jury through his police statements and argued by trial counsel. The court noted trial counsel's opinion that any motion related to the fragments would have been frivolous. The court concluded that any failure by counsel to object to the destruction of the bottle fragments or file a motion to dismiss as a result of law enforcement's failure to preserve the fragments did not "arise to the level of" ineffective assistance. The court noted that the Petitioner "received a fundamentally fair trial and [counsel] was able to articulate a well-reasoned self-defense argument."

Relative to the Petitioner's decision not to testify, the post-conviction court disagreed with the Petitioner's assertion that his self-defense claim could only be supported by his testimony, noting that the Petitioner's "lengthy" police statements was played for the jury. The court found that the Petitioner participated in a "thorough" Momon colloquy, after which the trial court concluded that the Petitioner made a voluntary decision not to testify, free of any coercion. The post-conviction court found that the Petitioner benefitted from the jury's exposure to his police statements without the "risk of skillful cross-examination." The court noted trial counsel's hearing testimony regarding the Petitioner's inconsistent versions of events, as well as counsel's averment that the defense team never "forced or threatened" the Petitioner. The court found that the Petitioner made a knowing and intelligent waiver of his right to testify.

Relative to the prospective trial witnesses, the post-conviction court found that Dr. Garrison "mentioned" diminished capacity in a report assessing the Petitioner's competency, that Dr. Garrison found the Petitioner competent to stand trial, that Dr. Garrison routinely included the possibility of diminished capacity in his reports and also "when asked, [found] that there [was] no diminished capacity present." The court noted

---

[14] We note that the first post-conviction court made no findings of fact in its memorandum opinion relative to the beer bottle.

Dr. Garrison's testimony at the sentencing hearing that he was "not concluding that [the Petitioner] ha[d] diminished capacity[.]" The post-conviction court concluded that no evidence in the record established that the Petitioner was rendered incapable of forming the requisite intent to commit first degree murder as a result of a mental disease or defect. The court noted that the Petitioner presented no evidence suggesting that he had diminished capacity. The court cited Mobley v. State, 397 S.W.3d 70, 84-88 (Tenn. 2013), for the proposition that subaverage intellectual functioning does not necessarily equate to a lack of capacity to form premeditation. The post-conviction court concluded that no reasonable probability of a different outcome existed if trial counsel had pursued a defense strategy of diminished capacity. The post-conviction court noted trial counsel's hearing testimony that the Petitioner was "dead set" on asserting self-defense and that diminished capacity was not a viable defense in the Petitioner's case. The court concluded that trial counsel made a "well-reasoned tactical decision" to pursue self-defense and that counsel was not deficient in this regard.

Relative to Ms. Belew, the post-conviction court found that Ms. Belew did not testify at the post-conviction hearings and that the court could not speculate on what her testimony might have been relative to the Petitioner's seeing shadow demons. The court noted that no proof in the record suggested that the Petitioner claimed to see shadow demons during the shooting. Similarly, the post-conviction court found that the Petitioner failed to present as witnesses the unidentified expert witness on the effects of Xanax, T-Roy, or Blondie. The court noted its belief that the proffered testimony would not have been material to the defense.

Likewise, the post-conviction court found relative to the Petitioner's telephone records that he did not enter any such records into evidence at the post-conviction hearing. The court concluded that the Petitioner had failed to prove by clear and convincing evidence that the records would have shown Ms. Belew knew the Petitioner was coming to her apartment. The court concluded that even if trial counsel erred by failing to subpoena the records, the outcome of the trial would not have changed.

Finally, the post-conviction court found that the issue relating to trial counsel's motion to withdraw based upon a conflict of interest was without merit. The court noted that the trial court denied the motion after a hearing and that the Public Defender's Office, not trial counsel personally, had represented Mr. Beavers in an unrelated criminal case. The post-conviction court found that the Petitioner presented no evidence or witnesses to support his contention that as a result of the conflict, trial counsel "failed to subpoena . . . exculpatory witnesses that would have negated [Mr.] Beavers['s] credibility[.]" The court reiterated that it could not speculate as to the content of any such witness testimony. The court concluded generally that trial counsel's conduct did not fall below an objective

standard of reasonableness and that even if counsel rendered deficient performance, the outcome of the trial would not have changed.

## ANALYSIS

On appeal, the Petitioner contends that the post-conviction court erred by dismissing his post-conviction petition, arguing that he received the ineffective assistance of trial counsel because counsel (1) failed to file a motion to dismiss or object at trial to the destruction of exculpatory evidence; (2) "coerced" the Petitioner into choosing not to testify; (3) failed to pursue a defense theory of diminished capacity; (4) failed to interview or call several witnesses and subpoena the Petitioner's telephone records; and (5) failed to promptly file a motion to withdraw after a conflict of interest arose. The Petitioner also contends that he received the ineffective assistance of appellate counsel because counsel failed to call Ms. Belew as a witness at the sentencing hearing, raise an issue related to the beer bottle fragments on direct appeal, or timely file an application for permission to appeal to the Tennessee Supreme Court. The Petitioner also raises a due process issue relative to the State's failure to collect the beer bottle fragments. The State responds that the post-conviction court properly determined that trial counsel did not render ineffective assistance and that because the Petitioner was granted a late-filed Rule 11 appeal, he was not prejudiced by appellate counsel's deficiency.

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger v. State, 279 S.W.3d 282, 293 (Tenn. 2009) (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. In reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." Cooper v. State, 847

S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).

Prejudice requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger, 279 S.W.3d at 293-94 (Tenn. 2009). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

### a. Beer Bottle Fragments

#### i. Due Process

As a preliminary matter, the Petitioner raises a due process issue arising from the State's failure to collect the beer bottle fragments for gunshot residue testing or reconstruction. He argues that after taking the Petitioner's statement, police officers returned to Ms. Belew's apartment to photograph the bottle fragments in the garbage can but did not collect the fragments for fingerprint testing, gunshot residue testing, or reconstruction; consequently, the Petitioner avers that the State "knew of the broken beer bottle's exculpatory nature and intentionally destroyed it in order to negate the Petitioner's claim of self-defense." The State responds that the Petitioner has waived this issue for failure to raise it in the trial court or on direct appeal.

We agree with the State. Our supreme court has previously held that when a petitioner raises a due process claim for the first time in a post-conviction proceeding, it is waived. Mobley, 397 S.W.3d at 104 (citing Tenn. Code Ann. § 40-30-106(g) ("A ground

for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented" unless factors exist which do not apply here)). As in Mobley, the Petitioner's due process issue is more properly considered as a facet of his ineffective assistance claim.

### ii. Ineffective assistance

The Petitioner contends that trial counsel rendered ineffective assistance by failing to file a motion to dismiss or object to the State's not having collected the beer bottle fragments. The Petitioner argues that analysis of the fragments would have proven his self-defense theory. In a one-sentence statement in the appellate brief, he also argues without elaboration that appellate counsel was ineffective by failing to raise an issue related to the bottle on direct appeal. The State responds that trial counsel and appellate counsel were not deficient in this regard, noting trial counsel's opinion that any motion related to the fragments would have been frivolous and appellate counsel's inability to preserve an issue for appeal that was never raised by trial counsel.

At the post-conviction hearing, the Petitioner acknowledged that Ms. Belew swept up and disposed of the beer bottle fragments and that trial counsel could do nothing to retrieve them. Trial counsel testified that the crime scene photographs documented the bottle's presence and that counsel was able to use the bottle to corroborate the Petitioner's version of events, as documented by his police statements. Trial counsel was not deficient in this regard.

Relative to potential prejudice, the Petitioner did not establish that a motion or objection regarding the fragments would have been successful or would have made a difference in the outcome of his trial given the consistent eyewitness accounts belying his self-defense claim. Likewise, had appellate counsel raised a due process issue in the motion for a new trial or on appeal, it would have failed. The Petitioner is not entitled to relief on this basis.

### b. Petitioner's trial testimony

The Petitioner contends that trial counsel rendered ineffective assistance when they "coerced" him not to testify, arguing that the jury could not reasonably conclude that the Petitioner acted in self-defense without his trial testimony. The Petitioner notes his belief that all of the trial witnesses committed perjury, and he argues that trial counsel were "severely ineffective . . . when they advised him not to testify . . . by stating that the State would attempt to fault his self-defense strategy." The State responds that trial counsel were not deficient and did not force or threaten the Petitioner regarding his potential testimony.

As a preliminary matter, that the Petitioner's reliance on this court's opinion in State v. Dorothy Renate Gfeller, No. 87-59-III, 1987 WL 14328, at *1-5 (Tenn. Crim. App. July 24, 1987), is inapt. In Dorothy Renate Gfeller, the defendant was convicted of the first degree murder of her ex-husband, whom she shot inside his home. No one aside from the defendant witnessed the shooting, and the defendant argued that the victim had physically abused her, that the shooting was an accident, and that she acted in self-defense. Defense counsel allowed prejudicial character testimony into evidence because counsel intended for the defendant to elaborate on the subject during her testimony. However, at the last minute, counsel advised the defendant not to testify. This court concluded that counsel rendered ineffective assistance in this regard because the defendant alone could have given "a full version of her theory of the facts," including the "long history of the victim's abuse toward her," and she had no criminal record upon which she could have been impeached. Id. at *5.

In contrast, although the Petitioner also had no criminal record, multiple witnesses saw the shooting or corroborated the witnesses' testimony that the Petitioner left Ms. Belew's apartment and later returned and that the Petitioner was not being attacked at the time of the shooting. Mr. Beavers, Mr. Keel, Ms. Belew, and Mr. Pippen confirmed that the Petitioner left Ms. Belew's apartment before the shooting. Mr. Beavers, Mr. Keel, and Ms. Jacobson testified about the Petitioner's knocking on the apartment door and opening fire shortly after the door opened. Ms. Belew, Mr. Beavers, and Mr. Keel testified regarding the sequence of events before and during the shooting. In addition, unlike in Gfeller, the jury heard the Petitioner's version of events through his police statements.

Moreover, trial counsel testified that after questioning the Petitioner multiple times about the shooting, it became apparent that the Petitioner gave inconsistent versions of the relevant events and changed his story in response to cross-examination-style questions. After explaining to the Petitioner the State's evidence, his options, and the drawbacks of testifying when the police statements laid a foundation for the agreed-upon defense theory, counsel advised the Petitioner against testifying. Counsel also told the Petitioner that the ultimate decision was his. Thereafter, during the trial court's Momon colloquy, the Petitioner affirmed that his recorded statement was "good enough" and that he had decided not to testify voluntarily and free of any threats.

Further, when asked at the post-conviction hearing how counsel forced him not to testify, the Petitioner simply responded that he "took [counsel's] advice" and that at the time, the Petitioner understood counsel's reasoning. We agree with the post-conviction court that trial counsel's advice allowed the Petitioner, who had proven to be an inconsistent witness, to avoid cross-examination while giving the jury access to the self-defense theory through the Petitioner's lengthy police statements. The Petitioner did not allege in his testimony, and the record does not reflect, that counsel pressured or coerced

the Petitioner in any way. Counsel was not deficient, and the Petitioner is not entitled to relief on this basis.

### c. Diminished capacity

The Petitioner contends that trial counsel rendered ineffective assistance by failing to argue diminished capacity, citing no legal authority but reciting at length appellate counsel's opinion on the viability of a joint diminished capacity and self-defense theory. In support of this argument, the Petitioner asserts that trial counsel should have called Dr. Garrison and Ms. Belew as witnesses to testify about the Petitioner's seeing shadow demons. The Petitioner also argues that counsel should have subpoenaed the Petitioner's Centerstone records and presented Dr. Garrison's competency evaluation letter as evidence of his mental health issues. The Petitioner directs this court to Dr. Garrison's sentencing hearing testimony and defense investigator Loyce Payne's post-trial motion hearing testimony as proof of what Dr. Garrison and Ms. Belew, respectively, would have testified at trial.

Dr. Garrison testified at the sentencing hearing that when he composed the Petitioner's competency evaluation, he addressed standard topics included in the court order. Dr. Garrison's letter stated that the Petitioner "[did] appear to have a basis for a claim of diminished capacity," but Dr. Garrison clarified that he only intended to note the existence of grounds upon which a defense attorney might argue diminished capacity. Contrary to the Petitioner's assertion in his appellate brief that Dr. Garrison offered a "diagnosis of diminished capacity," Dr. Garrison specifically testified, "I am not concluding he has diminished capacity." Dr. Garrison based his opinion on the Petitioner's "Axis I" diagnoses. This limited testimony did not reflect that Dr. Garrison would have testified at trial that the Petitioner was suffering from diminished capacity such that the Petitioner was unable to form premeditation. We note that "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).

Relative to Ms. Belew's out-of-court statements to Mr. Payne or appellate counsel, they were excluded from a post-trial hearing as inadmissible hearsay; however, Mr. Payne testified during a subsequent offer of proof that Ms. Belew visited appellate counsel's office and conveyed that the Petitioner had told her about seeing shadow demons in his apartment. Ms. Belew also relayed to Mr. Payne that the State had told her during trial preparation not to mention the shadow demons and to fabricate the Petitioner's asking her to begin a romantic relationship with him. Mr. Payne stated that according to Ms. Belew, "her lack of compliance [with the State's instructions] would result in things going poorly for her regarding pending charges that she had. And she stated that she was told that if she

cooperated that the State would go easy on her." Mr. Payne said that Ms. Belew "slipped up" during her trial testimony in response to questions about her relationship with the Petitioner and that Ms. Belew averred that she "adjusted" her testimony after a recess in which the State reminded her of their arrangement. Finally, Mr. Payne said that Ms. Belew claimed to have told the police about the Petitioner's seeing shadow demons and that this fact should have appeared in her police statement.

The Petitioner has failed to prove that Ms. Belew would have testified to these facts at trial. Mr. Payne's recollection of Ms. Belew's out-of-court statement does not make a reliable substitute for her post-conviction hearing testimony, as evidenced by its exclusion from the post-trial hearing as inadmissible hearsay. See Black, 794 S.W.2d 757.[15] Ms. Belew was not presented as a witness at the post-conviction hearing or the post-trial motion hearing; as a result, this court will not speculate on what she might have testified under oath. Similarly, the Petitioner did not enter as an exhibit the Centerstone records he claims trial counsel should have subpoenaed; we cannot speculate on their contents. Id. We note that Ms. Belew testified at trial and was subject to thorough cross-examination, during which trial counsel noted that co-counsel "put some big holes" in her testimony; the effectiveness of cross-examination was reflected in some part by the jury's acquitting the Petitioner of aggravated assault relative to Ms. Belew.

Moreover, we agree with the post-conviction court's finding that the Petitioner has not presented any evidence to indicate that he would have successfully argued diminished capacity at trial. The only suggested basis for the Petitioner's diminished capacity was his seeing shadow demons and having anxiety attacks. However, the Petitioner admitted that he did not experience these symptoms at the time of the shooting. Trial counsel testified that diminished capacity was difficult to prove and for jurors to understand, and counsel specifically noted his concern that evidence of the Petitioner's mental health conditions would confuse the jury. In addition, counsel stated that the Petitioner was "dead set" on arguing self-defense from the beginning of his case and that the Petitioner's police statements supported that theory. We agree with the post-conviction court's conclusion that trial counsel made a "well-reasoned tactical decision" when choosing the defense strategy and that counsel was not deficient in this regard. The Petitioner is not entitled to relief on this basis.

---

[15] In addition, we note that the Petitioner does not address or explain how trial counsel should have discovered and presented Ms. Belew's alleged private conversation with the prosecutor during a recess at trial or her alleged-trial statements to appellate counsel and Mr. Payne. Relative to Ms. Belew's alleged statement to the police about the Petitioner's seeing shadow demons, this court considered the issue in the context of Brady and concluded that even if the statement existed, the State's failure to disclose it was not a due process violation because the statement was immaterial and would not have affected the outcome of the trial. Burgess, 2014 WL 309644, at *13.

### d. *Witnesses and telephone records*

The Petitioner contends that trial counsel was ineffective by failing to call several witnesses at trial, including Dr. Garrison and Ms. Belew, whose prospective testimony we addressed above; in addition, the Petitioner avers that counsel should have called an unidentified expert witness on the side effects of Xanax, Shawn Julian, T-Roy, and Blondie. In a related issue, the Petitioner argues that counsel should have subpoenaed the Petitioner's telephone records to prove that he did not send Ms. Belew text messages. The State responds that the Petitioner is not entitled to relief because he did not present the complained-of evidence and witnesses at the post-conviction hearing.

We may briefly dispense with this issue because as this court has stated repeatedly, if a petitioner alleges that trial counsel was ineffective for the failure to call certain witnesses or present evidence, he should present these witnesses and evidence at the post-conviction hearing. See Black, 794 S.W.2d at 757.[16] This court may not speculate on the content of the records or the proposed testimony. The Petitioner is not entitled to relief on this basis.

### e. *Motion to Withdraw*

The Petitioner contends that trial counsel rendered ineffective assistance by failing to promptly withdraw as counsel after it became apparent that the Public Defender's Office had also represented Mr. Beavers in an unrelated case; the Petitioner alleges that due to the existence of the conflict, trial counsel did not subpoena unidentified witnesses to impeach Mr. Beavers's credibility, and the Petitioner states without elaboration that the "direct conflict . . . caused there to be an improper investigation into the case, and trial counsel failed to protect the [Petitioner's] constitutional rights at trial which resulted in an unfair trial and due process violation." The Petitioner notes that he did not sign a waiver of the conflict as he contends was required by the Rules of Professional Responsibility. The State responds that the Petitioner has failed to present any proof to support his claims and that the record supports the post-conviction court's finding that the issue was without merit.

---

[16] We note that in the Petitioner's appellate brief, he recites for the first time information from court cases about the uses of Xanax, its side effects, and its addictiveness; in addition, he posits for the first time that his behavior in this case might have been attributed to undergoing Xanax withdrawal after Ms. Belew stole his medication. Notwithstanding the Petitioner's testimony during the post-conviction hearing that Ms. Belew lured him to the apartment in order to steal the "extra[ Xanax] she didn't get," indicating that he was not out of medication at the time of the shooting, facts or allegations in an appellate brief that were not made part of the record in the lower court are not evidence this court may consider. Tenn. R. App. P. 13(c); see Threadgill v. Board of Prof'l Resp., 299 S.W.3d 792, 812 (Tenn. 2009), overruled on other grounds by Lockett v. Board of Prof'l Resp., 380 S.W.3d 19, 28 (Tenn. 2012).

This court has previously concluded that "[t]rial counsel's failure to obtain a written waiver [of a conflict of interest] and to ensure that the trial court conducted a hearing on [a] conflict of interests issue, standing alone, does not entitle the [p]etitioner to relief." Larry E. Rathbone v. State, No. E2019-00447-CCA-R3-PC, 2020 WL 2079264, at *10 (Tenn. Crim. App. Apr. 30, 2020) (citing Thomas Keith Battle v. State, No. 01C01-9510-CR-00335, 1997 WL 13739, at *7 (Tenn. Crim. App. Jan. 16, 1997)). In this case, the Petitioner acknowledges that a pretrial motion to withdraw was filed and a hearing was held before his trial; his complaint appears to be that the motion was not filed earlier. However, the Petitioner does not allege that earlier filing would have persuaded the trial court to find a conflict existed. We note that the hearing transcript on the motion was not exhibited to the post-conviction hearing.

Trial counsel testified that another assistant public defender represented Mr. Beavers in an unrelated case that concluded before the Petitioner's trial. Counsel testified that the other attorney never discussed Mr. Beavers with the Petitioner's defense team or the District Public Defender. Counsel explained that the conflict was an appearance of impropriety relative to the duties owed to Mr. Beavers as a former client; counsel attempted to explain the conflict to the Petitioner, although counsel acknowledged that the issue was difficult to understand. The post-conviction court noted the trial court's determination that no conflict existed.

Relative to the Petitioner's allegation that trial counsel failed to call unidentified witnesses to impeach Mr. Beavers's credibility, he called no such witnesses at the post-conviction hearing. See Black, 794 S.W.2d at 757. Moreover, the Petitioner's general complaints regarding counsel's investigation and advocacy at trial are not sufficiently specific for this court to review, and they are unsupported by citations to the record or relevant authorities; as a result, they have been waived. See Tenn. R. App. P. 27(a)(7) (stating that an appellate brief should contain an argument setting forth "the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on."). The Petitioner is not entitled to relief on this basis.

### f. Rule 11 appeal

The Petitioner contends that appellate counsel provided ineffective assistance by failing to file a Rule 11 appeal. The State responds that the post-conviction court granted relief on this issue and that the Petitioner received a late-filed appeal.

We agree with the State and the post-conviction court that the Petitioner has already received the appropriate relief from appellate counsel's ineffective assistance. Because the

Petitioner was able to late-file a Rule 11 appeal, his issue in this regard is moot. The Petitioner is not entitled to relief on this basis.

g. *Appellate counsel*

The Petitioner contends that appellate counsel was ineffective by failing to call Ms. Belew as a witness in sentencing and by failing to raise the broken beer bottle issue on direct appeal. As stated above, Ms. Belew did not testify at the post-conviction hearing. See Black, 794 S.W.2d at 757. Likewise, as we discussed in the context of trial counsel's alleged ineffective assistance, the Petitioner has not established that a viable issue existed relative to the beer bottle. Moreover, he has not established that he would have been granted a new trial had this court found that a Ferguson violation occurred; the evidence of the Petitioner's guilt was substantial and based upon the testimony of multiple witnesses. The Petitioner is not entitled to relief on this basis.

CONCLUSION

Based on the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE